GREENBERG TRAURIG, LLP
IAN C. BALLON (SBN 141819)
Ballon@gtlaw.com
NINA D. BOYAJIAN (SBN 246415)
BoyajianN@gtlaw.com
REBEKAH S. GUYON (SBN 291037)
GuyonR@gtlaw.com
DAVID H. MARENBERG (SBN 329954)
MarenbergD@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Tel: 310-586-7700; Fax: 310-586-7800

Attorneys for Defendant AJ Press, LLC

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PUNCHBOWL, INC., a Delaware corporation<br><br>Plaintiff,<br><br>v.<br><br>AJ PRESS LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO.: 2:21-cv-03010-SVW-MAR<br><br>**DEFENDANT AJ PRESS, LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>*[Filed Concurrently with Separate Statement of Uncontroverted Facts; Request for Judicial Notice; Declaration of David H. Marenberg; Proposed Judgment]*<br><br>Date:     March 25, 2024<br>Time:     1:30 p.m.<br>Location:  Courtroom 10A, 10th Floor<br>          350 W. 1st St<br>          Los Angeles, CA 90012<br>Judge:   Hon. Stephen V. Wilson |

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD: PLEASE TAKE NOTICE** that on March 25, 2024, at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable Stephen V. Wilson, in Courtroom 10A, 10th Floor, 350 W. 1st Street, Los Angeles, CA 90012, Defendant AJ Press, LLC ("AJ Press") will and hereby does move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment against Plaintiff Punchbowl, inc. ("Plaintiff"). This Motion is made on the grounds that there are no triable issues of material fact with respect to Plaintiff's claims and that summary judgment should therefore be granted in favor of AJ Press as a matter of law. Specifically, there is no triable issue of material fact that AJ Press' challenged use of the common English-language word "punchbowl" is not likely to create consumer confusion or mistake as to the source or affiliation of AJ Press or its services.

This Motion is based on this Notice, the concurrently filed Memorandum of Points and Authorities, the concurrently filed Statement of Uncontroverted Facts, the Declaration of David H. Marenberg in support of AJ Press' Request for Judicial Notice, the exhibits thereto, all matters upon which judicial notice may be taken, the complete files and records in this action, and any argument the Court may permit.

This Motion is made pursuant to the Court's order dated January 25, 2024, that AJ Press "move for summary judgment, with briefing based on the traditional likelihood-of-confusion test, within twenty-one (21) days" of the order. Dkt. 47.


DATED: February 15, 2024                GREENBERG TRAURIG, LLP


                                    By: /s/ *Ian C. Ballon*
                                        Ian C. Ballon
                                        *Attorneys for Defendant AJ Press, LLC*

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ....................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................. 2

    A.  Defendant AJ Press and Its News Reporting ............................................ 2

        1.  *Punchbowl News*' Founders are Renowned Journalists with Large Followings ...................................................................... 2

        2.  *Punchbowl News* is a Publication in the Fields of Government, Politics, and Public Policy ............................................ 2

        3.  AJ Press' Use of PUNCHBOWL, Along with its Logo and Credo, Evokes the U.S. Capitol and Insider Politics by Design ............ 3

    B.  Plaintiff's Business and the punchbowl Mark .......................................... 6

    C.  Relevant Procedural History ......................................................................... 7

III. LEGAL STANDARD ............................................................................................. 9

IV.  ARGUMENT ............................................................................................................ 9

    A.  Factors Considered in the Likelihood of Confusion Analysis ......................... 9

        1.  Deciding Likelihood of Confusion on a Limited Record is Warranted ...................................................................................... 11

    B.  AJ Press' Expressive, Geographically Relevant, Dissimilar Use of the Common English-Language Word "Punchbowl" to Promote Unrelated Services is Unlikely to Confuse Consumers .................................. 12

        1.  The Parties' Offer Completely Unrelated Services .............................. 12

        2.  The Parties' Uses of the Common English-Language Word "Punchbowl" Are Dissimilar in Context, Reducing a Likelihood of Consumer Confusion ................................................... 13

            i.   AJ Press' Use of "Punchbowl" in Context is Visually Dissimilar to Plaintiff's Use ....................................... 13

            ii.  AJ Press' Use of "Punchbowl" in Context Conveys Different Connotations ................................................... 15

        3.  Plaintiff's "Punchbowl" Word Mark is a Weak Mark Entitled to Only a Restricted Range of Protection. ................................. 16

i

4.     The Record Reflects No Evidence of Either Party's Intent to Expand into the Other's Market.............................................. 16

5.     Readers of AJ Press' Subscription-Based Services Exercise a High Degree of Care ........................................................ 17

6.     The Record Reflects No Examples of Actual Source Confusion Caused by AJ Press' Use of "Punchbowl" as a Mark. ......................... 18

7.     There is No Evidence of AJ Press' Intent to Infringe........................ 22

8.     No Additional Discovery Would Alter the Balance of the Most Relevant *Sleekcraft* Factors................................................. 23

V.     CONCLUSION.............................................................................. 23

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Alchemy II v. Yes! Entm't Corp.*,
844 F. Supp. 560 (C.D. Cal. 1994) .................................................................. 18

*Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*, 21-55775,
2021 WL 3117239 (C.D. Cal. June 7, 2021), *aff'd*, 2022 WL 3210698 (9th
Cir. 2022) ....................................................................... 10, 12, 18, 21, 23

*Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found.
of Am., Inc.*,
307 F. Supp. 3d 260 (S.D.N.Y. 2018) ........................................................... 20

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ..................................................... 10, 16, 17, 18

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................... 9

*Arcona, Inc. v. Farmacy Beauty, LLC*,
976 F.3d 1074 (9th Cir. 2020) ..................................................................... 13

*Cairns v. Franklin Mint Co.*,
107 F. Supp. 2d 1212 (C.D. Cal. 2000) .................................................... 17, 18

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994) ....................................................................... 23

*Dfinity Found. v. Meta Platforms, Inc.*,
No. 22-cv-02632-CRB, 2022 WL 16857036 (N.D. Cal. Nov. 10, 2022) ... 13, 14, 15, 23

*Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*,
707 F.3d 869 (7th Cir. 2013) ................................................................. 11, 16

*Echo Drain v. Newsted*,
307 F. Supp. 2d 1116 (C.D. Cal. 2003) .................................................... 21, 22

*Glow Indus., Inc. v. Lopez*,
252 F. Supp. 2d 962 (C.D. Cal. 2002) ..................................................... 14, 16

*Golden Eye Media U.S., Inc. v. Trolley Bags UK, Ltd.*,
525 F. Supp. 3d 1145 (S.D. Cal. 2021) .......................................................... 13

*Instant Media, Inc. v. Microsoft Corp.*,
No. C 07-02639 SBA, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ..................... 18

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
    304 F.3d 936 (9th Cir. 2002) ...................................................................... 11, 12, 17, 22

*Jack Daniel's Props. v. VIP Prods. LLC*,
    599 U.S. 140 (2023) ......................................................................................... *passim*

*Lang v. Retirement Living Pub. Co., Inc.*,
    949 F.2d 576 (2d Cir. 1991) ................................................................................. 18, 19

*Lopez v. Adidas Am., Inc.*,
    No. 19-cv-7631 (LJL), 2020 WL 2539116 (S.D.N.Y. May 19, 2020) ............. 11, 14, 16

*M2 Soft. Inc. v. M2 Commc'ns, L.L.C.*,
    149 F. App'x 612 (9th Cir. 2005) ................................................................................ 22

*M2 Soft., Inc. v. Madacy Entm't*,
    421 F.3d 1073 (9th Cir. 2005) ............................................................... 9, 10, 17, 22

*Mattel, Inc. v. MCA Records, Inc.*,
    28 F. Supp. 2d 1120 (C.D. Cal. 1998) ................................................................. 10, 20

*Mejia and Assocs., Inc. v. IBM Corp.*,
    920 F. Supp. 540 (S.D.N.Y. 1996) ............................................................................ 13

*Miller v. Glenn Miller Prods., Inc.*,
    454 F.3d 975 (9th Cir. 2006) ...................................................................................... 9

*Mintz v. Subaru of Am., Inc.*,
    716 F. App'x 618 (9th Cir. 2017) .............................................................. 11, 13, 15, 23

*Murray v. CNBC*,
    86 F.3d 858 (9th Cir. 1996) .............................................................................. *passim*

*Mytee Prods., Inc. v. Shop Vac Corp.*,
    No. 13cv1610 BTM (BGS), 2013 WL 5945060 (S.D. Cal. Nov. 4, 2013) ................... 18

*Nat'l Info. Corp. v. Kiplinger Wash. Editors, Inc.*,
    771 F. Supp. 460 (D.D.C. 1991) ................................................................................ 17

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) .................................................................................... 10

*Nora Beverages Inc. v. Perrier Grp. of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001) ...................................................................................... 21

*Nutri/System, Inc. v. Con-Stan Indus., Inc.*,
    809 F.2d 601 (9th Cir. 1987) ...................................................................................... 16

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
    578 F.3d 1154 (9th Cir. 2009) .................................................................................... 15

iv

*Orr v. Bank of Am., NT & SA*,
   285 F.3d 764 (9th Cir. 2002) ....................................................................... 18

*Punchbowl, Inc. v. AJ Press, LLC*,
   52 F.4th 1091 (9th Cir. 2022), *opinion withdrawn on other grounds*, 78
   F.4th 1158 (9th Cir. 2023) .............................................................. 8, 12, 23

*Punchbowl, Inc. v. AJ Press LLC*,
   549 F. Supp. 3d 1061 (C.D. Cal. 2021), *rev'd on other grounds*, 90 F.4th
   1022 (9th Cir. 2024) ..................................................................... 3, 18

*Punchbowl, Inc. v. AJ Press, LLC*,
   90 F.4th 1022 (9th Cir. 2024) ..................................................... *passim*

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) ..................................................................... 10

*Robinson v. Hunger Free Am., Inc.*,
   No. 118CV00042LJOBAM, 2018 WL 1305722 (E.D. Cal. Mar. 13, 2018) ......... 11, 15

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ......................................................................... 1

*Self-Insurance Inst. of Am., Inc. v. Software and Info. Indus. Ass'n*,
   208 F. Supp. 2d 1058 (C.D. Cal. 2000) .................................................. 12, 13

*Triton Energy Corp. v. Square D Co.*,
   68 F.3d 1216 (9th Cir. 1995) ......................................................................... 9

*Trovan Ltd. v. Pfizer Inc.*,
   107 F. App'x 788 (9th Cir. 2004) ................................................................. 17

**Federal Statutes**

15 U.S.C. § 1114 ........................................................................................... 7, 8, 9

15 U.S.C. § 1125(a) ......................................................................................... 8, 9

**State Statutes**

Cal. Bus. & Prof. Code § 17200 ........................................................................ 8

**Rules**

Fed. R. Civ. P. § 12(b)(6) ......................................................................... 1, 9, 11

Fed. R. Civ. P. § 56(a) ..................................................................................... 9

Fed. R. Civ. P. § 56(c)(4) ................................................................................ 18

Fed. R. Civ. P. § 56(d) ................................................................................... 23

Fed. R. Evid. § 801 ................................................................................................ 18

Fed. R. Evid. § 802 ................................................................................................ 18

Fed. R. Evid. § 901(a) ........................................................................................... 18

**Other Authorities**

6 *McCarthy on Trademarks and Unfair Competition* § 32:121.75 .................................... 11

1 *McCarthy on Trademarks and Unfair Competition* § 7:18 ........................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Punchbowl, Inc. ("Plaintiff"), a party planning and invitation company, seeks to prevent AJ Press, LLC ("AJ Press"), the owner and operator of a political news and commentary publication, *Punchbowl News*, from using the common, expressive word "punchbowl" in connection with its publications on politics and public policy. The Ninth Circuit Court of Appeals initially affirmed this Court's grant of summary judgment to AJ Press on a converted Rule 12(b)(6) motion on the grounds that Plaintiff failed to satisfy the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), but following the Supreme Court's decision in *Jack Daniel's Props. v. VIP Prods. LLC*, 599 U.S. 140 (2023), which held that *Rogers* does not apply where the accused mark is used as a source identifier, the Court of Appeals reversed and remanded with instructions to "proceed to a likelihood-of-confusion analysis." In doing so, the Court of Appeals advised, citing *Jack Daniel's*, that "not 'every infringement case involving a source-identifying use requires full-scale litigation,' and . . . some cases can be resolved at the Rule 12(b)(6) stage." *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1032 (9th Cir. 2024) ("*Punchbowl II*"). Indeed, *Jack Daniel's* endorses the early resolution of claims based on a defendant's dissimilar expressive use of a common English-language word, like "punchbowl," through the traditional likelihood of confusion analysis instead of *Rogers*.

Thus, very little remains to be determined on remand. The Ninth Circuit has already stated that AJ Press uses its mark "in an entirely different market." This alone precludes a finding of a likelihood of confusion. The Ninth Circuit has also acknowledged that "punchbowl" is a common English-language word, that AJ Press' name *Punchbowl News* conveys a different expressive connotation, and that *Punchbowl News* is visually dissimilar in context to Plaintiff's use of "punchbowl," which is itself a weak mark when used suggestively:

    

1

There is also no evidence Plaintiff intends to use "punchbowl" to expand into journalism or political commentary, and AJ Press adopted its mark with ample reason to believe it was not infringing. Consumers of AJ Press' publications and services are more discerning than the typical consumer, and the only examples Plaintiff offers of actual consumer confusion show the opposite, that consumers of *Punchbowl News* are not interested in Plaintiff's services and understand that AJ Press and Plaintiff are unaffiliated and offer unrelated services. No reasonable jury could conclude that consumers are likely to be confused, and no additional discovery could change this result. Summary judgment should therefore be granted in favor of AJ Press.

## II.    FACTUAL BACKGROUND

### A.    Defendant AJ Press and Its News Reporting

1.    *Punchbowl News*' Founders are Renowned Journalists with Large Followings

Renowned journalists Jake Sherman and Anna Palmer, *New York Times* best-selling authors who have been covering national politics for more than a decade, co-founded *Punchbowl News* in January 2021, along with John Bresnahan. Dkt. 28-1 ¶ 5. From 2016 to 2020, Mr. Sherman and Ms. Palmer co-authored the top-rated POLITICO Playbook franchise, a daily briefing on what was driving Washington. *Id.* ¶ 3. Under their leadership, the platform more than doubled in revenue and tripled its readership. *Id.* By 2020, hundreds of thousands of people subscribed to Playbook. *Id.* Mr. Bresnahan, among other things, is a veteran Capitol Hill journalist with more than 27 years covering Congress, the White House, and federal agencies. *Id.* ¶ 18. Mr. Bresnahan has won multiple awards for his writing and reporting. *Id.*

2.    *Punchbowl News* is a Publication in the Fields of Government, Politics, and Public Policy

AJ Press owns and operates *Punchbowl News*, an online membership-based news publication that provides newsletters, podcasts, and videos in the fields of government, politics, public policy, and current events. Statement of Uncontroverted Facts ("SUF") 1; Dkt. 28-1 ¶ 6. *Punchbowl News* provides curated, non-partisan commentary, opinions, and

2

critiques predominantly focused on the people and "insiders" (such as politicians, lobbyists, and aides) in Washington D.C. who make decisions, and on the news and events that move political markets. SUF 1; *Punchbowl II*, 90 F.4th at 1025-26. As this Court previously commented, AJ Press "targets individuals who follow politics closely." *Punchbowl, Inc. v. AJ Press LLC*, 549 F. Supp. 3d 1061, 1068 (C.D. Cal. 2021), *rev'd on other grounds by Punchbowl II*. Subscriptions to *Punchbowl News* range from $35-$100 a month and $350-$1200 a year. SUF 2.

AJ Press owns a federal trademark registration in PUNCHBOWL NEWS, in connection with, among other things, providing downloadable electronic newsletters, news, commentary, a website, podcasts, and entertainment services "in the field of government, politics, public policy, and current events." Declaration of David H. Marenberg in support of AJ Press' Request for Judicial Notice ¶ 19, Ex. 18. Plaintiff did not oppose AJ Press' application when it was published for opposition. *Id.* ¶¶ 20-21, Ex. 19-20.

>   3.   <u>AJ Press' Use of PUNCHBOWL, Along with its Logo and Credo, Evokes the U.S. Capitol and Insider Politics by Design</u>

AJ Press selected the name *Punchbowl News* to evoke the subject matter and geographic location of its news publication – people and events in and near the U.S. Capitol. SUF 3; *Punchbowl II*, 90 F.4th at 1026. "Punchbowl" is the Secret Service nickname for the U.S. Capitol. SUF 3; *Punchbowl II*, 90 F.4th at 1026. Given the insider subject matter and perspective of its publications, AJ Press thought it would be creative to incorporate a nickname created by insiders (i.e., the Secret Service) into the name of its publication. Dkt. 28-1 ¶ 8. Indeed, Mr. Sherman and Ms. Palmer have reported and written articles for *Punchbowl News* from the U.S. House of Representatives Periodical Press Gallery, inside the U.S. Capitol. *Id.*

The name *Punchbowl News* appears in all capital letters alongside AJ Press' distinctive logo and credo, which likewise reflect the subject matter and themes of the

*Punchbowl News* publication, examples of which are reproduced below. SUF 4-5; *Punchbowl II*, 90 F.4th at 1026; Dkt. 28-1, Exs. 2-6; Marenberg Decl., Exs. 9-10.

  

AJ Press specifically commissioned and selected its logo, which "depicts an overturned U.S. Capitol filled with bright pink/purple punch[,]" to "allude to the publication's focus on insider news and political commentary." *Punchbowl II*, 90 F.4th at 1026; Dkt. 28-1 ¶¶ 8-11.[1] AJ Press emphasized to the designer of its logo that its goal was to tie its imaging to the Capitol. *Id.* ¶ 10. Accordingly, nearly all the initial designs proposed to AJ Press related to the Capitol, and several depicted an overturned Capitol building, one of which AJ Press ultimately selected. *Id.*, Ex. 1 at 11-21.

AJ Press also considered the theme of its publication when selecting the color of the punch inside the inverted Capitol building logo. SUF 5; Dkt. 28-1 ¶ 11. AJ Press chose a bright pink color because it provides non-partisan commentary and pink is nonpartisan - neither blue nor red. SUF 5; Dkt. 28-1 ¶ 11; *Punchbowl II*, 90 F.4th at 1026 (noting the color of the punch is "an apparently playful homage to a blend of the traditional red and blue . . . that emphasizes the publication's nonpartisan stance"). Similarly, AJ Press adopted its credo, "POWER. PEOPLE. POLITICS." – which frequently accompanies the *Punchbowl News* name and logo – as a reflection of the subject matter and theme of its publication. SUF 5; *Punchbowl II*, 90 F.4th at 1026.

AJ Press thus intentionally emphasizes the connection between the *Punchbowl News* publication, the Capitol, insider news and political commentary, and nonpartisanship, including through the connotative name *Punchbowl News*, and the consistent display of the name, logo, and credo prominently throughout its website and publications. SUF 5.[2]

---

[1] A black, white, and pink color scheme also permeates the headings and layout of AJ Press' website and publications. SUF 6.
[2] Updates to the *Punchbowl News* website since the parties' earlier summary judgment briefing provide additional examples of the consistent and prominent use of the

4

Since the inception of *Punchbowl News*, AJ Press has also consistently publicized its connection to its founders. Dkt. 28-1 ¶ 12; *Punchbowl II*, 90 F.4th at 1026. Mr. Sherman, Ms. Palmer, and Mr. Bresnahan are well-known in the political news industry and have reputations for being top-tier reporters. Dkt. 28-1 ¶ 19. AJ Press has consistently stated on the *Punchbowl News* website that *Punchbowl News* is founded by Mr. Sherman, Ms. Palmer, and Mr. Bresnahan and has always depicted a large image of them on the *Punchbowl News* website, as shown below. SUF 4.



Dkt. 28-1 ¶ 12; *Punchbowl II*, 90 F.4th at 1026.

In addition, AJ Press' publications have explicitly stated "By John Bresnahan, Anna Palmer, and Jake Sherman" near the name *Punchbowl News* at the top of the publications, as shown below. Dkt. 28-1 ¶ 13, pp. 27, 32, 38, 40.



---

*Punchbowl News* name, logo, and credo in various combinations. *See* PUNCHBOWL NEWS, http://punchbowl.news (last visited Feb. 9, 2024); Declaration of David H. Marenberg in support of AJ Press' Request for Judicial Notice ("Marenberg Decl."), Exs. 9-10.

**B.    Plaintiff's Business and the punchbowl Mark**

Plaintiff alleges that it owns and operates punchbowl, an online platform that provides greeting cards, online invitations, information about vendors, and other party planning services and uses the mark punchbowl in connection with those services. SUF 7-8; Dkt. 29-2 at 22 ("We are a platform for online invitations and digital greeting cards.").[3] Plaintiff advertises template invitations and greeting cards offered on its website, www.punchbowl.com under headings that include "Birthday," "Kids Characters," "Care & Concern," "Super Bowl®" and "Wedding." SUF 10; Marenberg Decl., Exs. 1-3 at 4, 7, 10. Plaintiff "works with companies such as The Walt Disney Company, Chuck E. Cheese, and Dave & Busters to help them promote their brands through online invitations." *Punchbowl II*, 90 F.4th at 1025. Plaintiff organizes events at entertainment "venue partners" listed on Plaintiff's website, such as Color Me Mine, Gymboree, and LEGOLAND. Marenberg Decl., Ex. 4 at 13. Plaintiff markets itself as being "The Gold Standard in Online Invitations & Greeting Cards[.]" SUF 10. Plaintiff's website also provides a directory for consumers to search for venues and vendors typically used for parties and events, such as caterers, DJs, and limo services. SUF 11.

---

[3] Plaintiff describes itself as a "technology company that develops online communications solutions for consumers" in a transparent attempt to blur the obvious distinction between the greeting card and party-based services it provides with the politics-based online news publication AJ Press provides. *See* Compl. ¶ 18. But Plaintiff's word mark "was registered primarily in connection with the '[t]ransmission of invitations, documents, electronic mail, announcements, photographs and greetings'; '[p]arty planning'; and '[p]reparation of electronic invitations, namely, providing . . . software that enables users to . . . customize electronic invitations.'" SUF 9; *Punchbowl II*, 90 F.4th at 1025.



          

Plaintiff's website generally displays the word mark "punchbowl" alongside a punch ladle logo, as shown above. SUF 12-13. Plaintiff owns U.S. Trademark Registration No. 4,341,102 for the word mark "punchbowl" in connection with its greeting cards, online invitations, information about vendors, and other party planning services. SUF 9. Plaintiff does not purport to engage in, nor does its trademark registration reflect, any activity related to news reporting nor the fields of government, politics, public policy, or current events. Compl. ¶¶ 9-10, 14.

Plaintiff informed AJ Press of Plaintiff's alleged trademark rights in the word "punchbowl" on January 11, 2021. Compl. ¶ 26.

**C.   Relevant Procedural History**

After its first suit against AJ Press in the Eastern District of Virginia was dismissed due to improper venue, Plaintiff filed a new Complaint in this district on April 7, 2021, asserting claims for (1) federal trademark infringement under 15 U.S.C. § 1114, (2) federal unfair competition and false designation of origin under 15 U.S.C. § 1125(a), (3) common law trademark infringement, unfair competition, and passing off, and (4)

7

violations of California unfair competition law under Cal. Bus. & Prof. Code § 17200 arising from AJ Press' use of *Punchbowl News*, Punchbowl Press, and other alleged uses of the term "punchbowl." Compl. ¶¶ 30-58.

On July 16, 2021, after converting AJ Press' motion to dismiss into a motion for summary judgment, the Court granted summary judgment to AJ Press, holding that the *Rogers* test brought AJ Press' use of "punchbowl" outside the scope of the Lanham Act. Dkt. 31 at 3. Plaintiff appealed, and the Ninth Circuit initially affirmed. *Punchbowl, Inc. v. AJ Press, LLC*, 52 F.4th 1091, 1103 (9th Cir. 2022) (hereinafter "*Punchbowl I*"), *opinion withdrawn on other grounds*, 78 F.4th 1158 (9th Cir. 2023). The Supreme Court then decided *Jack Daniel's*, which held that *Rogers* does not apply where the defendant uses a term to identify its products or services, *i.e.* "as a mark." In light of this holding, the Ninth Circuit held that "[a]lthough it does not follow that [P]laintiff will ultimately prevail or even survive a future dispositive motion, . . . [AJ Press'] use of its mark is not immune from the traditional likelihood-of-confusion inquiry" and remanded the case for further proceedings with additional guidance. *Punchbowl II*, 90 F.4th at 1024.

In particular, the Court of Appeals stated that "the expressive nature of AJ Press' use of the Punchbowl Mark and the fact that 'punchbowl' is a common word will certainly be relevant in the likelihood-of-confusion analysis[,]" explaining that "[w]hen companies operating in different spaces use the same common words as trademarks with different expressive connotations, it reduces the likelihood of confusion." *Punchbowl II*, 90 F.4th at 1032; *see also id.* at 1024 (readopting facts "verbatim from" *Punchbowl I*). Likewise, the court noted that AJ Press' use of "Punchbowl" in connection with "Punchbowl *News*" and "Punchbowl *Press*" would be a "relevant consideration in assessing the likelihood of confusion." *Id.* It instructed the Court to "proceed to a likelihood-of-confusion analysis" and stated that the Court could "consider whether this analysis can be conducted on the present record." *Id.* Citing *Jack Daniel's*, 599 U.S. at 157 n.2, the Ninth Circuit explained that "not 'every infringement case involving a source-identifying use requires full scale

8

litigation' and . . . some cases can be resolved at the Rule 12(b)(6) stage." *Punchbowl II*, 90 F.4th at 1032.

On remand, this Court ordered AJ Press to move once more for summary judgment, "with briefing based on the traditional likelihood-of-confusion test." Dkt. 47.

## III.  LEGAL STANDARD

A court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not every factual dispute defeats summary judgment; only a "genuine issue of material fact" may sway the court's determination. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original). There is "no requirement that the trial judge make findings of fact." *Id*. at 250. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient" to defeat a motion for summary judgment. *Triton Energy Corp. v. Square D Co*., 68 F.3d 1216, 1221 (9th Cir. 1995). Where, as here, "the non-moving party bears the burden of proving the claim [], the moving party can meet its burden by pointing out the absence of evidence from the non-moving party." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).

## IV.  ARGUMENT

### A.  Factors Considered in the Likelihood of Confusion Analysis

"To maintain an action for trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), and unfair competition under California law, a plaintiff must prove the defendant's use of the same or similar mark would create a likelihood of consumer confusion." *Murray v. CNBC*, 86 F.3d 858, 860 (9th Cir. 1996). "A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or associated with, the services of another provider." *Id.* at 861. "The confusion must be probable, not simply a possibility." *Id.*; *M2 Soft., Inc. v. Madacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005)

9

("[Defendant's] use of [its] mark was not 'likely to confuse *an appreciable number* of people as to the source of the product'"); *Aliign Activation Wear, LLC v. lululemon athletica Canada Inc.*, 21-55775, 2021 WL 3117239, at *2 (C.D. Cal. June 7, 2021) (Wilson, J.) ("Confusion on the part of a negligible number of consumers is insufficient for the trademark holder to prevail."), *aff'd*, 2022 WL 3210698 (9th Cir. 2022).

"If goods or services are totally unrelated, there is no infringement because confusion is unlikely." *Murray*, 86 F.3d at 860. "Related goods are those products which would be reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 n.10 (9th Cir. 1979). If the Court determines that the goods or services are related, the Court then considers a number of non-exhaustive factors, if relevant: (1) the strength of the mark; (2) the proximity of the goods or services; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods or services and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product or service lines. *Sleekcraft*, 599 F.2d at 348.[4]

Various "contextual considerations" can also render a likelihood of confusion implausible. *See Jack Daniel's*, 599 U.S. at 157 n.2. The use of a mark in a way that expresses a different connotation is also pertinent "in assessing the likelihood of confusion between two marks[.]" *See id.* at 161 ("[a] trademark's expressive message . . . may properly figure in assessing the likelihood of confusion"); *Punchbowl II*, 90 F.4th at 1031

---

[4] "The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) ("The list of [*Sleekcraft*] factors is not a score-card—whether a party 'wins' a majority of the factors is not the point."); *Lopez v. Adidas Am., Inc.*, No. 19-cv-7631 (LJL), 2020 WL 2539116, at *9 (S.D.N.Y. May 19, 2020) (granting defendant's motion to dismiss on likelihood of confusion grounds even though analogous factors were evenly split between the parties). The Court may discount less pertinent factors and can consider other variables if warranted by the facts of the case. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1209-10 (9th Cir. 2012); *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1144 (C.D. Cal. 1998) (considering the "First Amendment interests at stake" in addition to other factors).

10

("When companies operating in different spaces use the same common words as trademarks with different expressive connotations, it reduces the likelihood of confusion."); *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 943 (9th Cir. 2002) (affirming that there was no likelihood of confusion from the Defendant's use of EPIX that evoked a different connotation, despite the fact that both parties "maintained an Internet presence").

       1.   <u>Deciding Likelihood of Confusion on a Limited Record is Warranted</u>

       The Supreme Court recently endorsed the early disposition of trademark infringement claims (including at the Rule 12(b)(6) stage) based on "dissimilarity in the marks or various contextual considerations." *Jack Daniel's*, 599 U.S. at 157 n.2 (citing 6 *McCarthy on Trademarks and Unfair Competition* § 32:121.75 (citing cases)); *Punchbowl II*, 90 F.4th at 1031; *see also Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620 (9th Cir. 2017) ("Likelihood of confusion can be determined at the pleading stage where the parties have obviously dissimilar marks."); *Murray*, 86 F.3d at 861 (affirming grant of Rule 12(b)(6) motion to dismiss based on a finding of no likelihood of confusion as a matter of law between defendants' unrelated services); *Eastland Music Grp., LLC v. Lionsgate Entm't, Inc.*, 707 F.3d 869, 871 (7th Cir. 2013) (affirming dismissal of claim that the defendant's "50/50" mark used in connection with a motion picture infringed the plaintiff's "PHIFTY-50" mark used on its website, album, and t-shirt, noting that the "50/50" was a common phrase); *Robinson v. Hunger Free Am., Inc.*, No. 118CV00042LJOBAM, 2018 WL 1305722, at *3 (E.D. Cal. Mar. 13, 2018) (holding that the plaintiff failed to plausibly allege a likelihood of confusion between the parties' "Hunger Free America" marks, which were visually dissimilar); *Lopez*, 2020 WL 2539116, at *13 (granting motion to dismiss, holding that "LES BENJAMINS" and "LES NYC" footwear marks were unlikely to be confused because "[t]he marks are too dissimilar, the evidence of actual confusion is too weak and too attenuated, and the absence of any allegation of bad faith . . . is too pronounced").

**B.**  **AJ Press' Expressive, Geographically Relevant, Dissimilar Use of the Common English-Language Word "Punchbowl" to Promote Unrelated Services is Unlikely to Confuse Consumers**

    1.  <u>The Parties' Offer Unrelated Services</u>

Consumer confusion is highly unlikely as a matter of law because AJ Press' services are completely unrelated to Plaintiff's. *See Murray*, 86 F.3d at 860 (holding that that a plaintiff's consumer survey services, conducted for use in business clients' television advertising, were unrelated as a matter of law to the defendant's network television programming and telephonic consumer polling "occasionally distributed to the news media"). Here, Plaintiff offers party planning services and sells customized digital invitations to birthdays, wedding showers, and Super Bowl watch parties. SUF 7-11.  In contrast, AJ Press provides non-partisan Beltway insider news reporting and political commentary. SUF 1; *Punchbowl II*, 90 F.4th at 1025-26. Indeed, the Ninth Circuit has previously acknowledged that "AJ Press uses the Mark 'in an entirely different market.'" *Punchbowl I*, 52 F.4th at 1104; *Punchbowl II*, 90 F.4th at 1032 (stating that the fact that companies are "operating in different spaces" reduces likelihood of confusion).

No reasonable consumer would believe Plaintiff's themed customizable event invitations and AJ Press' insider scoops on the status of congressional legislation were associated or came from the same source. Any incidental similarities between the parties' services or target audiences, such as the fact that both parties provide information or communicate online (Dkt. 29 at 16), or that both parties offer their services to consumers that may also have children, (Dkt. 29-2 at 20, 22) exist at such a high level of generality as to render related all online services offered to consumers. *See Interstellar*, 304 F.3d at 942-43 (holding services were unrelated where "both parties maintained an Internet presence, but marketed to a different consumer base" despite superficial overlap in services' "incidental purpose"); *Aliign*, 2022 WL 3210698, at *1 ("That both companies use the Internet generally as a marketing channel 'does not shed much light on the likelihood of consumer confusion.'"); *Self-Insurance Inst. of Am., Inc. v. Software and*

*Info. Indus. Ass'n*, 208 F. Supp. 2d 1058, 1073 (C.D. Cal. 2000) (holding that the parties "offer[ed] services that are non-related," reasoning that "[a]lthough both [parties] lobby, provide information and organize conferences, it is the content of each of these that is relevant to the Court's analysis"); *Mejia and Assocs., Inc. v. IBM Corp.*, 920 F. Supp. 540, 548 (S.D.N.Y. 1996) ("By increasing the level of generality, any products can be made to appear to fall in the same class.").

This factor therefore weighs *strongly* in AJ Press' favor, and there is no need to reach the remainder of the *Sleekcraft* factors. *Murray*, 86 F.3d at 860.

    2.   <u>The Parties' Uses of the Common English-Language Word "Punchbowl" Are</u>
<u>Dissimilar in Context, Reducing a Likelihood of Consumer Confusion</u>

        i.    *AJ Press' Use of "Punchbowl News" in Context is Visually Dissimilar*
*to Plaintiff's Use*

The dissimilar use of the common English-language word "punchbowl" in context is also "particularly probative." *See Golden Eye Media U.S., Inc. v. Trolley Bags UK, Ltd.*, 525 F. Supp. 3d 1145, 1225 (S.D. Cal. 2021) (internal quotation marks omitted); *Jack Daniel's*, 599 U.S. at 157 n.2; *Mintz*, 716 F. App'x at 620 (holding that on a motion to dismiss, "[l]ikelihood of confusion can be determined . . . where the parties have obviously dissimilar marks"). The Court must consider the sight, sound,[5] and meaning of each mark "in their entirety and as they appear in the marketplace[,]" rather than in isolated, contrived instances. *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080 (9th Cir. 2020); *Dfinity Found. v. Meta Platforms, Inc.*, No. 22-cv-02632-CRB, 2022 WL 16857036, at *5-6 (N.D. Cal. Nov. 10, 2022) (criticizing plaintiff for comparing its mark to a "fleeting" version of a defendants' mark instead of as it typically appeared on webpages); Compl. ¶ 21 (presenting truncated depiction of the word "punchbowl," instead of *Punchbowl News*, out of context, to make AJ Press' use appear more similar).

---

[5] AJ Press' mark also includes the additional word *News*, so the sound of AJ Press' mark is also dissimilar to Plaintiff's.

Here, Plaintiff's mark generally appears at the top of its website next to a logo of a white ladle against an orange background. SUF 12; *Punchbowl II*, 90 F.4th at 1025. In contrast, the word "Punchbowl" generally appears in all capital letters as part of the *Punchbowl **News*** name, alongside the overturned U.S. Capitol logo filled with pink/purple punch, and often alongside the credo, "POWER. PEOPLE. POLITICS." SUF 4; *see Punchbowl II*, 90 F.4th at 1032 (stating that AJ Press' use of "Punchbowl *News*" instead of "punchbowl" is "a relevant consideration in assessing the likelihood of confusion").

 

AJ Press' black, white, and pink color scheme also permeates the punchbowl.news website and publications, whereas Plaintiff's logo appears in orange typically against a multi-colored background as shown above. SUF 6, 12-13. AJ Press has also consistently publicized its founders' affiliation with *Punchbowl News*, including by displaying their names prominently below the *Punchbowl News* name and logo and displaying a large image of them on the *Punchbowl News* website. SUF 4; Dkt. 28-1 ¶ 12, pp. 23-23, 27, 32, 38, 40; *Punchbowl II*, 90 F.4th at 1026 ("*Punchbowl News* frequently promotes its connection to its founders."); *see Dfinity*, 2022 WL 16857036, at *7 ("The marks are even more dissimilar when they are accompanied by the parties' names, which happens often (though not always) in commercial settings."); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 996 (C.D. Cal. 2002) (holding that defendant's inclusion of "by J. Lo," the celebrity sponsor of the product line, contributed to marks' dissimilarity in commercial context). The marks at issue are therefore visually dissimilar in context. *See One Indus., LLC v. Jim*

14

*O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009) (holding that a relevant consumer would be able to distinguish between the parties' products where, *inter alia*, the disputed marks were "surrounded by different designs"); *Robinson*, 2018 WL 1305722, at *4 (holding that parties' "Hunger Free America" marks were "very different in appearance").

   ii. *AJ Press' Use of "Punchbowl News" in Context Conveys Different Connotations*

  AJ Press' use of "Punchbowl News" also expresses a distinctive and dissimilar connotation or "meaning." *See Punchbowl II*, 90 F.4th at 1032 ("When companies operating in different spaces use the same common words as trademarks with different expressive connotations, it reduces the likelihood of confusion."). "AJ Press concentrates its reporting on the 'insiders' who make decisions in Washington, D.C." and "chose 'Punchbowl' because that is the nickname the Secret Service uses to refer to the U.S. Capitol." *Punchbowl II*, 90 F.4th at 1025-26. The *Punchbowl News* name was "selected to 'elicit the theme and geographic location' of the publication." *Id.* at 1026. Likewise, the "logo depicts an overturned U.S. Capitol filled with bright pink/purple punch—an apparently playful homage to a blend of the traditional red and blue associated with America's leading political parties that emphasizes the publication's nonpartisan stance." *Id.* Thus, AJ Press' use of "punchbowl," in commercial context, evokes both the color of punch (to connote the publication's nonpartisan stance) and the metonymic and geographically relevant meaning of "punchbowl" (to evoke Washington insider politics). Plaintiff uses only the literal meaning of punchbowl, evoking an informal house or office party.

  Finally, the fact that the only similarity, the word "punchbowl," "is a common word," militates in AJ Press' favor. *See Punchbowl II*, 90 F.4th at 1032; *Mintz*, 716 F. App'x at 621 (holding that the defendant's use of a design was "plainly not similar" to the plaintiff's trademark "except in the use of a common symbol"); *Dfinity*, 2022 WL 16857036, at *6, *11-12 (holding likelihood of confusion implausible where the only

shared similarity between the parties' design marks was the "general pattern" of an infinity symbol); *Eastland*, 707 F.3d at 871 (affirming dismissal of claim based on shared use of "50/50," a "familiar phrase," which "in ordinary usage is suggestive or descriptive"); *Lopez*, 2020 WL 2539116, at *9 (granting motion to dismiss claims based on shared use of common word "LES," pronounced differently).

Thus, this factor weighs especially strongly in AJ Press' favor. Where two parties offer unrelated services using plainly dissimilar marks, there is no plausible likelihood of confusion, let alone a triable issue of fact. *See Jack Daniel's*, 599 U.S. at 157 n.2.

3.  Plaintiff's "Punchbowl" Word Mark is a Weak Mark Entitled to Only a Restricted Range of Protection.

The weaker the mark, the less protection it is afforded. *Sleekcraft*, 599 F.2d at 349. A suggestive mark "suggests, rather than describes, an ingredient, quality or characteristic" of the service. *Nutri/System, Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 605 (9th Cir. 1987). Though Plaintiff does not sell physical punchbowls, it provides party planning services and customizable online invitations. *Punchbowl II*, 90 F.4th at 1025. Plaintiff admits its mark is suggestive, (Marenberg Decl., Ex. 13 at 7:11), and therefore weak. *Nutri/System*, 809 F.2d at 605 ("[D]escriptive or suggestive marks are 'weak.'").

Plaintiff's mark also exists in a field of similar registered marks containing the word "punchbowl" used in conceptually similar ways to Plaintiff's. *See* SUF 15; Marenberg Decl., Exs. 14-17 (four registered marks using "PUNCHBOWL" to promote bars, catering, bowling alleys, and entertainment services); *Glow*, 252 F. Supp. 2d at 991 (holding it was "not immediately clear that consumers" would associate the parties' respective uses of the word "glow" given its "relative conceptual weakness" and other third-party uses to sell similar products). This factor also favors AJ Press.

4.  The Record Reflects No Evidence of Either Party's Intent to Expand into the Other's Market.

Plaintiff has not and cannot show a "*strong* possibility of expansion into competing markets" prior to its awareness of AJ Press' use of *Punchbowl News*. *See M2 Software*,

421 F.3d at 1085 (rejecting argument that because the plaintiff "began to broaden marketing of its 'interactive content' on the internet," this factor should weigh in its favor); *Trovan Ltd. v. Pfizer Inc.*, 107 F. App'x 788, 790 (9th Cir. 2004) (disregarding evidence of plaintiff's intent to enter defendant's field that postdated the plaintiff's awareness of the defendant's mark); *Interstellar*, 304 F.3d at 943 (affirming finding of no likelihood that either company would "'bridge the gap' to the other company's products or services").

Here, the record reflects no evidence of Plaintiff's intent to expand into political journalism even after Plaintiff filed suit. Dkt. 28-1 ¶ 20. This factor favors AJ Press.

### 5. Readers of AJ Press' Subscription-Based Services Exercise a High Degree of Care

The subject matter of *Punchbowl News*, which appeals to an educated, discerning readership interested in insider politics, attracts the type of consumer who exercises a high degree of care. *See Sleekcraft*, 599 F.2d at 353 (holding that courts assume a "higher standard" of discernment than the "typical buyer exercising ordinary caution" when "the buyer has expertise in the field"); *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1218 (C.D. Cal. 2000) (finding that niche interest in the particular subject matter of defendant's product supports the conclusion that "the goods are not purchased impulsively"); *see also Nat'l Info. Corp. v. Kiplinger Wash. Editors, Inc.*, 771 F. Supp. 460, 465 (D.D.C. 1991) (finding that purchasers of financial publications were likely to exercise care). Indeed, this Court previously stated that AJ Press "targets individuals who follow politics closely." *Punchbowl*, 549 F. Supp. 3d at 1068. Further, AJ Press' subscriptions currently range from $35-$100 a month and $350-$1200 a year. SUF 2; *Sleekcraft*, 599 F.2d at 353 ("[W]hen the goods are expensive, the buyer can be expected to exercise greater care in his purchases . . . ."); *Cairns*, 107 F. Supp. 2d at 1217 (price ranging from $29.95 to $595.00 for defendant's memorabilia supported a finding that consumers would exercise care); *Mytee Prods., Inc. v. Shop Vac Corp.*, No. 13cv1610 BTM (BGS), 2013 WL 5945060, at *5 (S.D. Cal. Nov. 4, 2013) (retail price of $70-$80

for defendant's air movers supported finding that consumers would exercise care). Readers have an abundance of free options for their news, and subscriptions to even sophisticated publications such as the *New York Times* and the *Wall Street Journal* are advertised at $4/month and $2/month, respectively. SUF 2; *Aliign*, 2021 WL 3117239, at *9 (considering comparator products rather than absolute pricing to determine degree of consumer care). This factor also favors AJ Press.

6.   The Record Reflects No Examples of Actual Source Confusion Caused by AJ Press' Use of "Punchbowl" as a Mark.

The record reflects instances Plaintiff claims are evidence of actionable actual confusion. *See* Dkt. 29-2, Ex. B at 11-53. This purported evidence is inadmissible because it is unauthenticated, not based on personal knowledge, and clearly altered in preparation for litigation without attaching complete records for relevant context. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 801, 802, 901(a); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773, 777-78 (9th Cir. 2002) ("unauthenticated documents cannot be considered in a motion for summary judgment"); *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *14 (N.D. Cal. Aug. 13, 2007) ("A summary of purported telephone calls and written inquiries constitutes inadmissible hearsay."); *Alchemy II v. Yes! Entm't Corp.*, 844 F. Supp. 560, 569-70 (C.D. Cal. 1994) (excluding hearsay evidence of telephone calls from customers).[6]

Even if admissible, none of the examples reflects any consumer's belief that *Punchbowl News* is a source of party planning services or online greeting cards, or that any consumer was even a prospective purchaser of Plaintiff's services, so there "is no reason to believe that [any] confusion . . . could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *See Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (holding that the plaintiff's purported receipt of 400 calls from persons attempting to contact defendant's magazine failed to demonstrate a genuine issue of fact, where no evidence

---

[6] AJ Press reserves the right to address in its reply any admissible evidence Plaintiff may submit with its opposition.

18

linked the confusion "to any potential or actual effect on consumers' purchasing decisions," and plaintiff failed to show that misdirected callers were "prospective purchasers of [Plaintiff's] products").

For example, references to *Punchbowl News* as "Punchbowl" or "@Punchbowl[,]" Dkt. 29-2 at 38, are not evidence of confusion at all, let alone confusion as to source:



Even with only limited context to discern the parties' state of mind, these examples show the individuals intended to refer to the recognized *Punchbowl News* trademark or its official social media account by an abbreviation. *See* 1 McCarthy § 7:18 ("Americans are prone to abbreviate recognized trademarks and to use nicknames."). Similarly, Plaintiff mischaracterizes one tweet by AJ Press (who is not a consumer) as evidence of actual consumer confusion (Dkt. 29-2 at 17), but AJ Press expressly states "Subscribe @punchbowl.news[,]" referring to its own website, in a tweet relating to its own services.

Incomplete and altered examples of misdirected customer service communications (Dkt. 29-2 at 11-12, 14-16, 19-33, 35-37, 39-42) are also not evidence of actual consumer confusion. As Judge Owens stated during the parties' oral argument on appeal (with Plaintiff's counsel in agreement), "[i]t's one thing to get email addresses mixed up. It's another thing to think one company is another." *See* Marenberg Decl., Ex. 13 at 15:3-17; *Alzheimer's Disease and Related Disorders Ass'n, Inc. v. Alzheimer's Found. Of Am.,*

*Inc.*, 307 F. Supp. 3d 260, 294 (S.D.N.Y. 2018) (holding that receipt of over 11,000 misdirected checks was "unpersuasive"); *Mattel*, 28 F. Supp. 2d at 1149 (holding that 29 unsolicited emails and 10 oral inquiries to Plaintiff, some "inquir[ing] about obtaining the [Defendant's] song," were "ambiguous, at best, as to whether the [senders] believe[d] [Plaintiff was] responsible for the song" and therefore *de minimis*).

One apparent *Punchbowl News* customer, upon learning of Plaintiff's existence, was not only not confused as to the source of either party's services, but also had "no interest" in Plaintiff's services, even after Plaintiff apparently attempted to solicit her as a customer. Dkt. 29-2 at 36.



She just "want[ed] news" and did not want the services of a company that did not provide a "news outlet." *Id*.

1    Examples of text messages from acquaintances of Plaintiff's CEO only reflect their

2  awareness that Plaintiff and AJ Press are not affiliated, distinguishing between "they" or

3  "them" (*Punchbowl News*) and Plaintiff:

4

5

6

7

8

9

10

11

12

13

14

15



16  Dkt. 29-2 at 47-48; *Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1126 (C.D. Cal. 2003)

17  (holding that letters from the plaintiff's friends were "not probative of actual confusion");

18  *Aliign*, 2022 WL 3210698, at *1 (noting that evidence offered by the plaintiff "prove[d]

19  the opposite—that the potential customer was in no way confused"); *Nora Beverages Inc.*

20  *v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) ("Inquiries about the

21  relationship between an owner of a mark and an alleged infringer do not amount to actual

22  confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between

23  the [services] such as to inspire the inquiry itself.").

24    Finally, evidence that one Twitter user replied to a tweet by a *Punchbowl News*

25  founder that he "really hate[d] the name of your new endeavor. Punchbowl Ecards always

26  come to mind," shows only that the user understood "Punchbowl Ecards" was not one of

27  the "endeavor[s]" of Jake Sherman, co-founder of AJ Press. Dkt. 29-2 at 33; *see also id.* at

28  45.

21

In sum, the record contains no admissible evidence of the kind of confusion relevant to a Lanham Act claim, let alone evidence from an "appreciable number" of consumers. *M2*, 421 F.3d at 1085. Instead, the 'evidence' shows clear-headed consumers referring to *Punchbowl News* regarding its own services, becoming aware of Plaintiff for the first time, or understanding that the parties and their services are unrelated. Even this factor weighs in AJ Press' favor. *Echo Drain*, 307 F. Supp. 2d at 1127.

7.    There is No Evidence of AJ Press' Intent to Infringe.

There is no evidence in the record of any intent to infringe in AJ Press' selection of *Punchbowl News* as a mark. Rather, AJ Press intended to evoke the Secret Service nickname for the U.S. Capitol, which is both geographically and connotationally relevant to the subject matter of the *Punchbowl News* publications. Dkt. 28-1 ¶ 8; *Punchbowl II*, 90 F.4th at 1026. Although Plaintiff informed AJ Press of Plaintiff's mark (Compl. ¶ 26), AJ Press had every reason to believe in good faith that its own use of the common English-language word "punchbowl" was non-infringing in light of the parties' unrelated services and the conceptual and visual dissimilarity of the marks. *See M2*, 421 F.3d at 1084-85 (holding that this factor weighed in the defendant's favor where the evidence showed defendant's good faith belief that it could "carve out a non-infringing mark[,]" even after the defendant's attorney conducted a trademark search that uncovered the plaintiff's mark); *M2 Soft. Inc. v. M2 Commc'ns, L.L.C.*, 149 F. App'x 612, 614 (9th Cir. 2005) (finding that factor favored defendant where the defendant "believed that its own mark did not infringe [Plaintiff's] trademark rights" because the two parties offered products in different music genres); *Interstellar*, 304 F.3d at 946 (affirming finding that the defendant "adopted the name epix.com in good faith because it connoted electronic pictures"). This factor also favors AJ Press.

8.    No Additional Discovery Would Alter the Balance of the Most Relevant
     _Sleekcraft_ Factors.

In conclusion, any likelihood of confusion is exceedingly improbable, and AJ Press is entitled to judgment as a matter of law on Plaintiff's spurious Lanham Act claims.[7] There is ample support for the early disposition of spurious claims such as these, where the parties' services are plainly unrelated and the parties use dissimilar marks, without any discovery. *See Jack Daniel's*, 599 U.S. at 157 n.2; *Murray*, 86 F.3d at 861; *Mintz*, 716 F. App'x at 620. The record is "already replete with evidence as to how both companies used the name 'Punchbowl' in their operations." *Punchbowl I*, 52 F.4th at 1104; *Aliign*, 2021 WL 3117239, at *10 (holding that the "'record taken as a whole' could only lead a rational trier of fact to one conclusion: consumers purchasing [Defendant's] products know the products were created by [Defendant] and not [Plaintiff]"). No amount of discovery will change the nature of AJ Press' services or the how the *Punchbowl News* name appears in commercial context. Any continuance under Fed. R. Civ. P. 56(d) is therefore unwarranted, as Plaintiff fails to plausibly allege a likelihood of confusion to begin with.

## V.    CONCLUSION

AJ Press' motion for summary judgment should be granted in its entirety.

DATED: February 15, 2024          GREENBERG TRAURIG, LLP


                                  By: /s/ Ian Ballon
                                     Ian C. Ballon
                                     *Attorneys for Defendant AJ Press, LLC*

---

[7] Plaintiff's state statutory and common law claims fail for the same reasons. *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) (stating that UCL and common law unfair competition claims are "substantially congruent" to Lanham Act claims); *Dfinity*, 2022 WL 16857036, at *12 (dismissing attendant UCL and common law unfair competition claims on same grounds as Lanham Act claims).

### **L.R. 11-6.2 Certification of Compliance**

The undersigned, counsel of record for Defendant AJ Press, LLC, certifies that this brief contains 6,555 words, which complies with the word limit of L.R. 11-6.1.


DATED: February 15, 2024               GREENBERG TRAURIG, LLP


                                      By: /s/ Ian Ballon
                                          Ian C. Ballon
                                          *Attorneys for Defendant AJ Press, LLC*

24