GREENBERG TRAURIG, LLP
IAN BALLON (SBN 141819)
*Ballon@gtlaw.com*
NINA D. BOYAJIAN (SBN 246415)
*BoyajianN@gtlaw.com*
REBEKAH S. GUYON (SBN 291037)
*GuyonR@gtlaw.com*
DAVID H. MARENBERG (SBN 329954)
*MarenbergD@gtlaw.com*
1840 Century Park East, Suite 1900
Los Angeles, CA 90067-2121
Telephone: 310-586-7700
Facsimile: 310-586-7800

Attorneys for Defendant AJ Press, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | |
|---|---|
| PUNCHBOWL, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AJ PRESS LLC, a Delaware limited liability company,<br><br>Defendant. | CASE NO.: 2:21-cv-03010-SVW-MAR<br><br>**AJ PRESS, LLC'S FURTHER REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>*[Filed Concurrently with Declaration of David H. Marenberg; Declaration of Rachel Schindler; Declaration of Sarah Butler; Request for Judicial Notice in Support of Further Reply; L.R. 56-3 Response to Statement of Genuine Disputes of Material Fact; Supplemental Evidentiary Objections to Opposition to Motion for Summary Judgment]*<br><br>Assigned to: Judge Stephen V. Wilson<br>Action Filed: April 7, 2021 |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

ACTIVE 699752953

TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 1

II. ARGUMENT ........................................................................................................ 2

    A. There is No Genuine Dispute That the Parties' Services are Unrelated ................ 2

    B. The Parties' Use of Internet Marketing Channels Remains Irrelevant .................. 4

    C. There Remains No Genuine Dispute that the Parties' Marks Are Dissimilar ....... 5

    D. Plaintiff's Evidence of Alleged Actual Confusion is *De Minimis* and Immaterial ..................................................................................................... 6

        1. Plaintiff's Survey is Glaringly Absent, and AJ Press's Survey is Definitive ............................................................................................. 6

        2. Plaintiff's "[A]bout 100" Instances of So-Called Actual Confusion Are *De Minimis*, Speculative, and Not Probative of Relevant Confusion ............................................................................................. 7

    E. Plaintiff's Mark Remains Weak, *Punchbowl News* Subscribers Exercise a High Degree of Care, AJ Press Lacked Any Bad Faith in Adopting *Punchbowl News*, and Plaintiff Provides No Evidence of AJ Press's Intent to Expand into the Customizable Event Invitations and Greeting Cards Market .................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Aliign Activation Wear, LLC v. Lululemon Athletica Can., Inc.*,
  No. 21-55775, 2022 WL 3210698 (9th Cir. 2022) .................................................. 5, 6, 7

*Alzheimer's Disease and Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*,
  307 F. Supp. 3d 260 (S.D.N.Y. 2018) ................................................................................ 10

*Am. Dairy Queen Corp. v. W.B. Mason Co., Inc.*,
  No. 18-CV-693, 2022 WL 2760024 (D. Minn. July 14, 2022) ........................................ 4

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 2010) ............................................................................................... 2

*Arcona, Inc. v. Farmacy Beauty, LLC*,
  976 F.3d 1074 (9th Cir. 2020) ............................................................................................. 2

*Brockmeyer v. Hearst Corp.*,
  248 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................................... 7

*Codename Enters. v. Fremantlemedia N. Am., Inc.*,
  16 Civ. 1267, 2018 WL 3407709 (S.D.N.Y. Jan. 12, 2018) ....................................... 9, 10

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ............................................................................................. 8

*Heartsprings, Inc. v. Heartspring, Inc.*,
  143 F.3d 550 (10th Cir. 1998) ............................................................................................ 4

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
  304 F.3d 936 (9th Cir. 2002) ............................................................................................... 8

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
  645 F. Supp. 3d 185 (S.D.N.Y. 2022) .......................................................................... 8, 10

*Jim S. Adler, P.C. v. McNeil Consultants, LLC*,
  No. 3:19-cv-2025, 2023 WL 5600128 (N.D. Tex. 2023) ............................................... 11

*Lang v. Ret. Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991) ................................................................................................ 9

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC*,
  673 F. Supp. 3d 1017 (D. Ariz. 2023) ............................................................................. 10

*Mattel, Inc. v. MCA Records, Inc.*,
  28 F. Supp. 2d 1120 (C.D. Cal. 1998), *aff'd*, 296 F.3d 394 (9th Cir. 2002) ................ 10

*Morrison Entm't Grp., Inc. v. Nintendo of Am., Inc.*,
 56 F. App'x 782 (9th Cir. 2003) ................................................................................ 7

*Multi Time Mach., Inc. v. Amazon.com, Inc.*,
 804 F.3d 930 (9th Cir. 2015) ................................................................................ 6, 9

*Nordstrom, Inc. v. Nomorerack Retail Grp., Inc.*,
 No. C12-1853, 2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) ................................. 9

*Nutri/System, Inc. v. Con-Stan Indus.*,
 809 F.2d 601 (9th Cir. 1987) ................................................................................ 10

*Oculu, LLC v. Oculus VR, Inc.*,
 No. SACV 14–0196, 2015 WL 3619204 (C.D. Cal. June 8, 2015) ............................. 5

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
 55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir. 1999) ................. 7

*Protect-A-Car Wash Sys. v. Car Wash Partners, Inc.*,
 276 F. Supp. 3d 439 (D. Md. 2017) ........................................................................ 11

*Surfvivor Media, Inc. v. Survivor Prods.*,
 406 F.3d 625 (9th Cir. 2005) ........................................................................ 2, 7, 10

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
 295 F.3d 623 (6th Cir. 2002) ................................................................................ 11

*Univ. Money Ctrs., Inc. v. AT&T*,
 22 F.3d 1527 (10th Cir. 1994) .............................................................................. 11

**Other Authorities**

McCarthy on Trademarks § 32:189 & nn. 1-3 ............................................................ 7

I. **INTRODUCTION**

After allowing Plaintiff Punchbowl, Inc. ("Plaintiff") seventy-five days to conduct discovery it claimed was critical to oppose Defendant AJ Press, LLC's ("AJ Press") motion for summary judgment, Plaintiff ultimately adds no material evidence from which a reasonable jury could find a likelihood of confusion.

The Ninth Circuit stated in no uncertain terms that AJ Press uses its mark "in a completely different market"; that fact remains unchanged. Under the mark "punchbowl," Plaintiff still provides online invitations and greeting cards primarily to mothers with young children. Under the mark "*Punchbowl News*," AJ Press, by contrast, provides inside-the-Beltway political news and commentary, to a ███████████████████████████████████████ ███████████████████████████████████. Plaintiff seeks to monopolize all online uses of the common English language word "punchbowl," a word used in numerous marks, no matter how remote the parties' services.

On other *Sleekcraft* factors, Plaintiff likewise identified no new evidence learned in discovery that would create a dispute of material fact. "punchbowl" remains weak as a matter of law and visually and acoustically dissimilar to *Punchbowl News* in all commercial contexts, as well as in connotation. Plaintiff was able to confirm its prior knowledge that, unsurprisingly, the parties both used internet search engines and social media as marketing channels, which remains immaterial. Plaintiff has no intent to offer its own events, and AJ Press's events will continue to be focused, as before, on inside-the-Beltway politics and in service of its core product, its thrice-daily newsletters. Despite arguing that discovery could reveal the smoking gun of AJ Press's bad faith when it selected its mark, Plaintiff is now conspicuously silent on this factor. Discovery also confirmed that AJ Press's customers express niche interest in news about D.C. insider politics, and it remains undisputed that AJ Press offers its services at a comparatively high premium.

Critically, as part of its efforts to persuade the Court to allow additional time for the parties to conduct discovery, Plaintiff disclosed that it had retained an expert to conduct a survey showing likelihood of confusion. But now that the additional discovery period has concluded, Plaintiff's expert's survey is nowhere to be found; one can fairly surmise that the absence of a

ACTIVE 699752953

survey is due to Plaintiff's failure to obtain results that are favorable to it. Nevertheless, in reliance on Plaintiff's representation that it had retained a survey expert, AJ Press retained its own survey expert, who performed their own survey revealing that a mere **0.5%** of respondents (i.e., far short of the threshold for a finding of likelihood of confusion) believed that the *Punchbowl News* website and services were affiliated with or originated from the same source as Punchbowl. After withdrawing much of its prior evidence, Plaintiff submits a new undifferentiated fire hose of "about 100" examples of so-called actual confusion, regardless of probative value, to generate a disputed material fact where there is none. Even if all the examples constituted evidence of actual forward confusion (and they do not, as a matter of law), those examples would still be *de minimis* in light of the total volume of customer interactions across the two parties' services.

The undisputed material facts militate that summary judgment be granted to AJ Press.

## II.     ARGUMENT

### A.     There is No Genuine Dispute That the Parties' Services are Unrelated

Discovery has confirmed that there is no genuine dispute of material fact that e-greeting cards and party invitations are not remotely related to insider political news, let alone proximate services. *See Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1080 (9th Cir. 2020) (no likelihood of consumer confusion from identical marks if the alleged infringer is in a "wholly different industry"). The top ten most searched terms on Plaintiff's website over the past four years have included ████████████████████████ not a single search term in the top 50 bore any relationship to news or politics. Marenberg Declaration ("DHM Decl."), Ex. 1. The fact that an affluent parent with a young child may be interested in both political news and in sending a Super Mario-themed party invitation (*see* Opp. 12-13) does not bear on the relatedness or proximity of the parties' services. Plaintiff provides no evidence that a reasonable consumer would think that both types of services would originate from the same source or website if offered under the same name. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 n.10 (9th Cir. 2010); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 632 (9th Cir. 2005).[1]

---

[1] Plaintiff's CEO, a reasonable consumer, did not assume websites for Delta Faucets® and Delta Air Lines® were put out by the same source, despite the fact that he has flown on Delta,

ACTIVE 699752953

1   In contrast, overwhelming evidence shows that reasonable consumers do *not* expect these kinds of services to originate from one source. Several X/Twitter users expressed doubt that an e-card company would be providing the insider political news *Punchbowl News* offers; one even found it so implausible as to mock a former press secretary for mis-tagging Plaintiff. DHM Decl., Exs. 2-4. This belief was also shared by Plaintiff's own customer service team, who routinely told consumers that they were a "platform that provide[d] online invitations and digital greeting cards," because it understood that identifying those products would make the lack of affiliation with AJ Press obvious. *See, e.g.*, Dkt. 77-3 at PB_34; Dkt. 56-2 at 22 (of 59).

Likewise, the parties' target and actual customer bases are superficially "overlap[ping]" in the way that all unrelated audiences do, in that they all include humans, as demonstrated by Plaintiff's Venn diagram. AJ Press counts among its actual subscribers political junkies, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DHM Decl., Exs. 3-4, Ex. 5 at AJP_381-82. In contrast, when pitching advertising space on its platform to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiff ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DHM Decl., Exs. 8 at PB_840, 9 at PB_873, 10 at PB_892, Ex. 11 at 88:15-92:18, 94:21-96:13. Not once did Plaintiff advertise any of its users' purported interests in news or politics.[2] *Id.* When *receiving* advertising pitches from pharmaceutical and tobacco lobbyists that Plaintiff's COO believed were intended for *Punchbowl News*'s customers, she informed them that their proposals would not appeal to

---

and, as he reluctantly admitted, Delta planes have bathrooms with faucets. DHM Decl., Ex. 11 at 85:1-87:5; Ex. 12 ("delta" google search results shown to Plaintiff's CEO).

[2]   Plaintiff and its CEO now state that this market research data from a company called Quantcast, which Plaintiff continued to pay for as of June, was "notoriously inaccurate," suggesting it routinely misrepresented its actual customer base's interests to advertisers. DHM Decl., Ex. 11 at 96:4-97:3; Dkt. 76-3 ("Fader Decl.") ¶ 17. That same data shows that broken down further, any interest in "news" reflected in Punchbowl users' browsing patterns is attributed by Quantcast to news about the weather and commutes, not D.C. insider political updates, for which Punchbowl users have a below-average (<100) affinity. DHM Decl., Ex. 13 (PB_950

3

Punchbowl's audience of "primarily moms with young kids." Dkt. 56-2 at 19-20, 22 (of 59); *Am. Dairy Queen Corp. v. W.B. Mason Co., Inc.*, 2022 WL 2760024, at *70 (D. Minn. July 14, 2022) (finding "negligible" proximity between the parties' BLIZZARD milkshakes and bottled water, since both products had "very different audience appeal").

As of 2019, Plaintiff claimed to have sent out ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (DHM Decl., Ex. 8 (PB_860)), so it is immaterial as a matter of law that ▮ of Plaintiff's customers from ▮▮▮▮ organized their own politically themed events. *See* Dkt. 76-7, Ex. D. Plaintiff does not claim to organize its own events. *See Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 556 (10th Cir. 1998) (plaintiff's HEARTSPRINGS educational materials and defendant's HEARTSPRING school did not provide products to the same consumer groups).

Finally, Plaintiff claims that a "Google Analytics report" shows that "▮▮▮▮▮" of its current site visitors "identify" as having browsing interests encompassed by the category "News & Politics/Avid News Readers/Entertainment News Enthusiasts." Opp. 14. This document is a red herring. First, the document does not show users identifying themselves as anything. Rather, these analytics are provided by Google. Plaintiff does not know how any of these users are categorized or how categories are determined. DHM Decl., Ex. 11 at 99:9-100:19; Fader Decl. ¶ 19. Second, *Punchbowl News* does not provide "Entertainment News." Third, the same document shows just ▮ of the ▮▮▮▮ visitors to Plaintiff's site ▮▮▮▮ were interested in "News & Politics," dead last. Dkt. 76-6, Row 133. In fact, according to this document, ▮ of these users are paying Punchbowl customers—▮▮▮▮ was apparently generated from site visits of users falling in any of these categories. *Id.* (far right column). Finally, unlike the Quantcast data it shows to advertisers, Plaintiff has no idea how this data compares to the interests of the average internet user. DHM Decl., Ex. 11 at 88:16-90:7, 96:15-19, 100:20-101:3. The data reflected in this document, even if admissible, is meaningless.

**B.    The Parties' Use of Internet Marketing Channels Remains Irrelevant**

Plaintiff again contends, without supporting authority, that because both parties use search engine and social media marketing channels, a likelihood of confusion is increased. It does not

4

dispute that nearly all modern companies employ these channels. Dkt. 50 ("Mot.") 12, 17 (citing cases); Dkt. 59 at 4 (citing cases). The fact is therefore "not sufficient by itself for this factor to weigh in Plaintiff's favor." *Oculu, LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *17 (C.D. Cal. June 8, 2015). Other than search engine and social media marketing, the parties' advertising channels differ. Plaintiff also advertises through the Apple App Store and Google Play Store, on Pinterest, in print ads, and on local billboards near highways and in train stations. DHM Decl., Exs. 14-19. *Punchbowl News* instead advertises its services through its in-person events, other digital news media, the Apple Podcast App, Google Podcasts, and Spotify, and it also appears on broadcast cable news segments and late-night talk shows. *Id.*, Ex. 20; Dkt. 76-8 at 12-13. The parties' services are also only sold through their respective websites (except Plaintiff also sells its services through an app). *See Aliign Activation Wear, LLC v. Lululemon Athletica Can., Inc.*, 2022 WL 3210698, at *1 (9th Cir. 2022) (the "most significant factor" in affirming summary judgment was a similar lack of overlap of distribution channels). This factor weighs in AJ Press's favor. *Oculu, LLC*, 2015 WL 3619204, at *17.

C. **There Remains No Genuine Dispute that the Parties' Marks Are Dissimilar**

Plaintiff adds no new evidence to create a genuine dispute of material fact on this factor. Considering all commercial contexts in which the marks are used (*e.g.*, respective websites, Plaintiff's mobile app, social media, *Punchbowl News* in-person events, search engine results), it remains undisputed that *Punchbowl News* typically appears near the overturned Capitol building logo, its credo, and in a black, white, and pink color scheme. Dkt. 59-2 at 7-10, 13-14 (UMF 4, 6). In contrast, the color scheme of Plaintiff's home page changes with each holiday, and its word mark has appeared in purple, black, white, and *orange. Id.* at 18; *see* DHM Decl., Exs. 15, 21-24.[3]

Plaintiff argues that AJ Press ███████████████████████████████████████████████████████████████████████████ Opp. 15. But

---

[3] It also remains undisputed that *Punchbowl News* conveys a different, expressive connotation, which favors early resolution of Plaintiff's claim for First Amendment reasons separate from the *Rogers* test. *See* Mot. 8, 10 n.4.

5

this *Sleekcraft* factor asks whether two marks in commercial context are visually, audibly, or connotationally similar, not whether a word is "important" to "driving customers" to a website. *See* Mot. 15-16 (citing cases). The only relevance the purchase of a Google keyword could have to the likelihood of confusion analysis is that it may cause the parties' website links to appear near one another in Google search results, which was never disputed. *See* Dkt. 59 at 4 & n.4; *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 937 (9th Cir. 2015). Clear descriptions of the services alongside the parties' respective logos in these results eliminate *any possibility* that a reasonable consumer would be confused. *Id.* at 937 (holding that far less differentiated labeling eliminated any consumer confusion); *Aliign*, 2022 WL 3210698, at *2 (same); *see* Dkt. 60-2, Ex. 10 at 28-30 (search results showing the parties' logos and service descriptions).

Though none of this is relevant, Plaintiff also appears to misunderstand both the Google data and the AJ Press testimony it cites on the topic, which are undisputable evidence of how *unimportant* paid sponsored ads and organic (unpaid) search traffic is in driving consumers to *Punchbowl News* generally.[4] Other evidence AJ Press produced at Plaintiff's insistence, none of which is material, shows ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[5]

### D. Plaintiff's Evidence of Alleged Actual Confusion is *De Minimis* and Immaterial

#### 1. Plaintiff's Survey is Glaringly Absent, and AJ Press's Survey is Definitive

In opposing this motion, Plaintiff requested a continuance to conduct limited discovery, one of the primary purposes of which was to prepare a likelihood of confusion survey, submitting a detailed declaration from a survey expert it had retained, who set forth facts he would need to decide on a survey format and methodology. Dkt. 55-1 at 25-26, 56-5. AJ Press provided those

---

[4] *See* Declaration of Rachel Schindler in support of Further Reply ("Schindler Decl.") ¶¶ 4-15 (highlighting the difference between organic (unpaid) search traffic and paid search traffic).
[5] Schindler Decl. ¶¶ 28-29; *see also id.* ¶¶ 16-27 (explaining Plaintiff's misunderstanding of the importance of an organic impression as opposed to an organic click-through).

facts. Opp. 16. Yet after seventy-five days, Plaintiff puts forward no survey, and is maintaining that the expert's "initial draft work toward running a full survey" is not discoverable, all but confirming the pilot results were unfavorable to Plaintiff. Opp. 17 n.9; *see Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999) (plaintiff's failure to provide a survey "warrants a presumption that the results would have been unfavorable"), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Morrison Entm't Grp., Inc. v. Nintendo of Am., Inc.*, 56 F. App'x 782, 785 (9th Cir. 2003) (holding that "[t]he absence of such a survey is somewhat telling here," given the defendant's survey showed no likelihood of confusion).

To rebut Plaintiff's promised expert survey, AJ Press retained its own expert to conduct a survey. *See* Declaration of Sarah Butler, Ex. 1. AJ Press's survey unequivocally reaffirms that there is no likelihood of confusion as to source or affiliation from AJ Press's use of the common word "punchbowl." *See Surfvivor*, 406 F.3d at 633 (affirming grant of summary judgment, holding this factor favored defendants despite anecdotal evidence of actual confusion since defendant's survey "showed an absence of significant confusion"). Specifically, when likely consumers of *Punchbowl News*'s services were shown the *Punchbowl News* home page and asked industry standard open-ended questions about source and affiliation, just <u>one</u> respondent out of a test group of 203 (0.5%) indicated that "Punchbowl" put out the website and that this company or brand put out products associated with Plaintiff (greeting cards), a number far below that required to show a likelihood of confusion.[6] Butler Decl., Ex. 1 ¶ 11.

2. <u>Plaintiff's "[A]bout 100" Instances of So-Called Actual Confusion Are *De Minimis*, Speculative, and Not Probative of Relevant Confusion</u>

In the absence of a survey, Plaintiff argues it has now submitted "about 100" instances of actual consumer confusion, and that the mere existence of these hearsay or improperly authenticated documents raises a triable issue of fact.[7] They do not. Rather, the documents reflect

---

[6] Confusion results below 10% are a strong indicator that confusion is unlikely. *See* McCarthy on Trademarks § 32:189 & nn. 1-3; *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 298 (S.D.N.Y. 2003) (3% confusion is a "factor [that] weighs in favor of the defendants").

[7] Plaintiffs who can identify only minimally probative evidence on one *Sleekcraft* factor, as here, often unconvincingly argue "in broad strokes" that "a jury question exists on the issue" of likelihood of confusion, and rely heavily on analog era cases for the general proposition that "summary judgment is generally disfavored in the trademark arena." *See Aliign*, 2021 WL

7

that people fully understand the services that the respective parties provide, but will on occasion contact the wrong party (akin to dialing a wrong number), abbreviate a company's name (a common practice), or, in many instances, they reflect nothing of any consequence to this motion. As a preliminary matter, only about 29 of the approximately 80 instances raised in Plaintiff's prior opposition brief remain at issue; Plaintiff has tacitly withdrawn or abandoned over two thirds of its prior examples, which are not mentioned in its Opposition.[8] Plaintiff is now claiming to assert other examples of purported anecdotal evidence of confusion, all but six of which were already in its possession. Dkt. 76-3 at PB_942 (two misdirected communications from after March 2024); Stein Decl., Ex. A (AJPRESS_231, 233, 244, 340, produced by AJ Press).

However, misdirected customer service, media, and advertiser[9] inquiries to @punchbowl.com email addresses, @punchbowl.news email addresses, or both, which now comprise all of the "approximately 93" purported examples, are not evidence of actual confusion as a matter of law. Dkt. 59 at 7-8 (citing cases and distinguishing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002)); *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 261 (S.D.N.Y. 2022) (misdirected communications from "vendors, potential partners, and non-profit organizations" were "not probative of consumer confusion" even between competing products). Absent direct testimony (*see, e.g.*, *Entrepreneur*, 279 F.3d at 1149-51) that any sender was previously aware of the existence of a Punchbowl that provides e-cards, these examples are no more probative of affiliation confusion than of guessing that the @punchbowl.com *email address* belonged to *Punchbowl News*. See *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 944 (9th Cir. 2002) ("Although a consumer might incorrectly guess that United Van

---

3117239, at *15 (rejecting this argument, noting that in the years since the often-cited *Entrepreneur Media* case, "the Ninth Circuit has repeatedly affirmed summary judgment rulings where the record **as a whole** could not lead to a triable issue regarding the likelihood of confusion") (emphasis added), *aff'd*, 2022 WL 3210698 (9th Cir. 2022).

[8] *Compare* Dkt. 56-2 at 5-9 (15 abandoned news media references to *Punchbowl News* as "Punchbowl"), 12-15, 17-18, 29, 33-34, 38-39 43-53 (20 abandoned inadvertent mis-tags of Punchbowl's social media accounts, 14 abandoned "personal messages" to Punchbowl employees recognizing lack of affiliation, 2 misdirected media inquiries, and 1-2 "other") *with id.* at 11, 12, 14-16, 19-33, 35-37, 39-42, 54-59 (remaining purported misdirected customer service communications, media and charity inquiries, and one misdirected check).

[9] None of the purported advertiser and media inquiries are properly authenticated. *See* Dkt. 77-3 at PB_32, 63. 111, 125, 145, 219). Ms. Fader did not claim to create the documents and was not a party to those communications. Fader Decl. ¶ 8; DHM Decl., Ex. 25 (Resp. to ROG 1).

8

Lines would be found at www.united.com . . . such an erroneous guess does not generally amount to a likelihood of initial interest confusion.").[10] Further, 18 examples reflect at most the mental state of an assistant, intermediary, or technician acting on behalf of a *Punchbowl News* account holder, whose mental state cannot be determined at all from the document cited even if it fell into a hearsay exception. *See* Dkt. 77-3 at PB_313-15, 356-58, 419-20, 511-17, 637-39, 644-45, 695-99, 701-08, 757-61, 942-43 (assistants, two of whom also recognized their errors prior to receiving a response); 172-75, 644-45, 814-17 and 819 (IT personnel), 487-88 (colleague), 536-37 (intermediary), 572-73, 587-88 (office managers); *Multi Time Mach.*, 804 F.3d at 940 (testimony from the plaintiff's president that "someone named Eric" told him that he was confused was "too speculative" absent evidence that person "was a potential consumer"). Notably, none of Plaintiff's customer service inquiries involve purchasing decisions at all. *See Nordstrom, Inc. v. Nomorerack Retail Grp., Inc.*, 2013 WL 1196948, at *6 (W.D. Wash. Mar. 25, 2013) (holding that misdirected questions over the internet about product sizing and exchanges "[did] not rise to the level of actual confusion on a purchasing decision").[11]

Plaintiff speculates that misdirected customer service inquirers *must* have first scrolled through all of Plaintiff's home page and product offerings. Opp. 9-11. But one can simply email help@punchbowl.com to initiate a customer service inquiry with Plaintiff. *See* DHM Decl., Ex. 11 at 75:3-11. Plaintiff provides *no evidence* that this "multi-step" approach was required, or that any individual senders at issue viewed any of these pages.

Plaintiff also pads its submission with spam solicitations and inquiries it already knows have nothing to do with *Punchbowl News*. It claims three different *Punchbowl News* "Google Ad account managers" misdirected emails to Plaintiff, and also continues to cite its employees'

---

[10] For example, after emailing *Punchbowl News* employees for several months, one user inadvertently sent one email to an @punchbowl.com email address, so it was received as a Help Scout inquiry. The user then stated that he had already "realized that [he] had .com and not .news" after sending his last message before Plaintiff could provide its form response. *See* Dkt. 77-3 at PB_576-84; *Nordstrom*, 2013 WL 1196948, at *6. Plaintiff still *features* that one erroneous email as an example of actual consumer affiliation confusion. Opp. 6. No reasonable juror could agree.
[11] *See also Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582-83 (2d Cir. 1991) ("Lang has not shown that these misdirected callers were prospective purchasers of Lang's products"); *Codename Enters. v. Fremantlemedia N. Am., Inc.*, 2018 WL 3407709, at *10 (S.D.N.Y. Jan. 12, 2018) (misdirected messages leaving feedback or questions about services did not involve "confusion about purchasing decisions").

9

speculation that a charity located near Plaintiff intended to contact *Punchbowl News*. Opp. 6, 8 (citing PB_63, 88, 145, 847). None of these senders have any affiliation with *Punchbowl News*, (Schindler Decl. ¶¶ 30-38), as Plaintiff is aware. DHM Decl., Ex. 26 at 109:16-24 (naming third party company that handles *Punchbowl News*'s ███████████████; Dkt. 59 at 8 & n.9. Plaintiff also buries examples where users were expressly aware of the parties' lack of affiliation or were not confused. Dkt. 77-3 at PB_219, 612-14, 829, 835; DHM Decl., Ex. 27 (PB_868-69) (showing users in 829, 835, and 868 were not confused, and Plaintiff apologized). Finally, some examples simply show irrational consumer behavior, whether acting out of carelessness or stress. *See* Dkt. 77-9 at AJP_340; Dkt. 77-3 at PB_99-103, 111-12, 135-39, 152-54, 195-97. Some baseline of confusion from consumers "is inevitable" because "befuddlement is part of the human condition." *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148 (C.D. Cal. 1998), *aff'd*, 296 F.3d 394 (9th Cir. 2002). Contrary to Plaintiff's claim, this does not "automatically create a triable issue of fact." *Id.*; *see* Opp. 8.

The four misdirected communications sent to *@punchbowl.news* email addresses by ostensible *Punchbowl* customers (Dkt. 77-9 at AJP_231, 233, 244, 340) are also not relevant to a theory of forward confusion, *see Surfvivor*, 406 F.3d at 630, which is the only type of confusion Plaintiff has asserted in its Complaint. *See id.* at 631 (affirming grant of summary judgment, ignoring a theory of confusion not referenced by the plaintiff in the complaint); Dkt. 1 ¶¶ 34, 44.

Even if *all* remaining anecdotal examples were at least minimally probative of actual consumer confusion, this evidence would at best be *de minimis* given the large volume of consumer transactions at issue. *See Nutri/System, Inc. v. Con-Stan Indus.*, 809 F.2d 601, 606 (9th Cir. 1987) (holding that any actual confusion was *de minimis* in light of the total volume of both parties' business).[12] In comparison to 89 asserted misdirected communications to Plaintiff,

---

[12] Indeed, courts across the country agree that volumes of misdirected communications similar to or greater than those present in this case still fall short of showing a likelihood of confusion after considering total transaction volume. *See, e.g., Alzheimer's Disease and Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 294 (S.D.N.Y. 2018) (11,000 misdirected checks over one decade "largely unpersuasive" absent evidence of "total receipts"); *Codename*, 2018 WL 3407709, at *11 (24 misdirected emails were *de minimis* given availability of service to "millions of households"); *Jackpocket*, 645 F. Supp. 3d at 261 (10 misdirected emails were "a small fraction of the tens of thousands of emails [defendant's email address] receive[d] each year"); *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 673 F.

Plaintiff fielded (1) likely ▮▮▮ of Help Scout inquiries per year during this period; (2) had ▮▮▮ visitors, ▮▮▮ of impressions, and ▮▮▮ of click-throughs to the punchbowl.com platform in the last year alone; (3) currently has ▮▮▮ subscribers and over ▮▮▮ app downloads; and (4) sent out about ▮▮▮ of greeting cards yearly. Dkt. 76-6; DHM Decl., Ex. 11 at 70:1-22, 73:6-17, 74:6-16, Exs. 17-18. In comparison to the 6 cited communications received by an @punchbowl.news email address, AJ Press's customer service email has fielded over 10,000 inquiries since its 2021 launch, and AJ Press had around ▮▮▮ total subscribers as of March and saw over ▮▮▮ site visitors in the past two years. *Id.*, Ex. 26 at 120:16-121:6, Ex. 28; Schindler Decl. ¶ 29. In light of the volume of lucid consumer interactions with both parties daily and AJ Press's unequivocal survey results, Plaintiff's examples are not probative, do not raise an issue of material fact, and this factor is at best neutral.

E. **Plaintiff's Mark Remains Weak, *Punchbowl News* Subscribers Exercise a High Degree of Care, AJ Press Lacked Any Bad Faith in Adopting *Punchbowl News*, and Plaintiff Provides No Evidence of AJ Press's Intent to Expand into the Customizable Event Invitations and Greeting Cards Market**

Plaintiff identifies no new evidence on any of these remaining *Sleekcraft* factors.

*Strength of the mark*: Plaintiff's mark remains a presumptively weak suggestive mark, and there is no evidence that its marketing expenditures "have been effective in making consumers associate [punchbowl] with [Plaintiff]" as opposed to others (or no one) in a populous "punchbowl" field. *See* Dkt. 59 at 9 (citing cases).

---

Supp. 3d 1017, 1033 (D. Ariz. 2023) (236 instances of actual confusion *de minimis* in light of 110,000 opportunities for confusion); *Univ. Money Ctrs., Inc. v. AT&T*, 22 F.3d 1527, 1535 (10th Cir. 1994) (400 instances of consumers mistaking defendants' ATMs for plaintiffs' *de minimis*); *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, 2023 WL 5600128, at *9 (N.D. Tex. 2023) (1,595 misdirected calls over 3 years, less than 10% of the total number of calls received by defendant during that period, were *de minimis*); *Protect-A-Car Wash Sys. v. Car Wash Partners, Inc.*, 276 F. Supp. 3d 439, 453-54 (D. Md. 2017) (22 instances of actual confusion *de minimis* in light of the fact that plaintiff's services are rendered over a million times per year); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 635 (6th Cir. 2002) (6 misdirected e-mail messages "much less probative of actual confusion" when measured against defendant's total sales of over 3 million products in 3 years and 11,000 misdirected calls).

ACTIVE 699752953

    *Degree of consumer care*: AJ Press's subscription prices remain significantly more expensive than subscriptions to other benchmark publications. Dkt. 59-2 at 5 (UMF 2). Misdirected communications from non-purchasers, such as assistants, are again not indicative of the care exercised by actual purchasers of *Punchbowl News*. Opp. 8 (citing only two examples of someone discussing their own account or expenditure). Misdirected communications from subscribers describing themselves as educated (*id.* (citing PB_014, 353)) show the subscribers explaining in great detail what service they were searching for and why; after learning Plaintiff could not provide it, there is no evidence they bought Plaintiff's non-competing service instead. Plaintiff cites no authority that the degree of care in emailing the correct email address or customer service platform is relevant to this factor. The facts showing the degree of care *Punchbowl News* customers exercise in their *purchasing decisions* remain undisputed.

    *Intent*: Despite suggesting that discovery would reveal some bad faith when AJ Press selected its mark (Dkt. 56-3 at 2), Plaintiff now leaves out discussion of this factor entirely. In addition to the prior founder testimony (*see* Dkt. 59-2 (UMF 3, 5); Dkt. 28-1 ¶¶ 8-11, Ex. 1 at 11-14, 16-21), additional documentary evidence confirms that prior to becoming aware of Plaintiff's existence, AJ Press was considering several different candidates for its brand identity, each selected to evoke the subject matter of AJ Press's anticipated publication. DHM Decl., Exs. 29-31. Only *after* AJ Press had conceived of a mark that included the word "Punchbowl", the Secret Service nickname for the Capitol building, did AJ Press learn of Plaintiff's existence in ▉▉▉▉▉. *Id.*, Ex. 26 at 21:22-23:21, Ex. 29. This factor weighs heavily in its favor. Dkt. 59 at 10-11 (citing cases).

    *Expansion*: Discovery revealed no new evidence that would show a "*strong* possibility of expansion into competing markets" by either party. *See* Dkt. 59 at 11 (citing case). *Punchbowl News* events have indisputably remained focused on insider politics, even if, at the conclusion of the event, *Punchbowl News* holds a cocktail hour. Dkt. 76-8 at 8-9 (describing events).

Dated: July 5, 2024                          GREENBERG TRAURIG, LLP

                                                  By:  */s/ Ian Ballon*
                                                      Ian C. Ballon
                                        Attorneys for Defendant AJ Press, LLC

ACTIVE 699752953

**L.R. 11-6.2 Certification of Compliance**

The undersigned, counsel of record for Defendant AJ Press, LLC, certifies that this brief contains 4,063 words, which complies with the word limit of L.R. 11-6.1.

DATED: July 5, 2024                GREENBERG TRAURIG, LLP

By: /s/ *Ian Ballon*
     Ian C. Ballon
     *Attorneys for Defendant AJ Press, LLC*

13

ACTIVE 699752953